UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD HOWELL, and<br>N.E.S.A.I.M., LLC<br>    Plaintiffs, | :<br>:<br>:<br>: | CIVIL CASE NO.<br>3:22-CV-01160 (JCH) |
| v. | :<br>: | |
| YALE UNIVERSITY,<br>    Defendant. | :<br>:<br>: | SEPTEMBER 26, 2023 |

**RULING ON DEFENDANT'S PARTIAL MOTION TO DISMISS (DOC. NO. 12)**

**I.    INTRODUCTION**

Plaintiffs Todd Howell ("Mr. Howell") and N.E.S.A.I.M., LLC ("N.E.S.A.I.M.") bring this action against Yale University ("Yale" or "the University"), alleging, breach of contract, breach of implied covenant of good faith and fair dealing, violation of 42 U.S.C. § 1981, violations of the federal and state constitutions, and intentional infliction of emotional distress.  See Compl. (Doc. No. 1).

Yale moves to dismiss the plaintiffs' Equal Protection, Due Process, and intentional infliction of emotional distress claims.  See Partial Mot. to Dismiss (Doc. No. 12); Mem. of Law in Support of Partial Mot. to Dismiss ("Mem.") (Doc. No. 13); Reply to Opp. to Partial Mot. to Dismiss ("Reply") (Doc. No. 16).  Plaintiffs oppose this Motion. See Obj. to Def.'s Partial Mot. to Dismiss ("Obj.") (Doc. No. 14).

For the reasons discussed below, the court grants in part and denies in part the Partial Motion to Dismiss.

1

## II.     BACKGROUND

N.E.S.A.I.M. "is a minority owned domestic limited liability company" that provides snow and ice removal services.  Compl. at 1, ¶¶ 2, 6.  Mr. Howell "is a [B]lack, African-American small business owner, and a principal in the plaintiff N.E.S.A.I.M.."  Id. at ¶ 4.  Joseph Signore ("Mr. Signore") is "the Supervisor of Landscaping and Maintenance Services" at Yale.  Id. at ¶¶ 10-11.  The plaintiffs allege, and the University does not contest, that Mr. Signore is an agent of the University and "his actions were undertaken in furtherance of his role as Supervisor . . ."  Id. at ¶ 11.

On or about November 20, 2019, the plaintiffs entered into a contract with Yale to provide the University with snow and ice removal services.  Id. at ¶ 6.  On or about November 29, 2019, Mr. Signore met with the plaintiffs and other N.E.S.A.I.M. personnel.  Id. at ¶¶ 9-11.  At this meeting, Mr. Signore allegedly became aware that Mr. Howell was involved with N.E.S.A.I.M. and the contract at issue.  Id. at ¶ 13.  The plaintiffs allege that Mr. Signore "expressed his distaste" for Mr. Howell "as a minority contractor," "direct[ing] his hatred" at Mr. Howell.  Id. at ¶¶ 14, 17.  They further allege that Mr. Signore additionally expressed his dislike of minority contractors and employees in general, naming other Black contractors by name, and that these sentiments were based on the contractors' race.  Id. at ¶ 17.

Mr. Signore allegedly made the following representations: "[L]ike all other [B]lack minority contractors, N.E.S.A.I.M. would not have adequate or proper tools to do the contracted for job, would not have sufficient employees, would use improperly or undocumented employees, and would add employee numbers to the balance sheets"; "[B]lack minority contractors, including the plaintiff N.E.S.A.I.M., performed horribly"; and that "he hates dealing with minority owned businesses."  Id. at ¶¶ 15-16.

2

Following these remarks, Mr. Signore refused to honor the ice and snow removal contract. Id. at ¶ 18. The plaintiffs allege that "his hatred of minority contractors trumped" his acknowledgment of "the plaintiffs' extensive experience" and completion of "$60,000,000.00 in snow removal." Id. at ¶¶ 18, 19.

The plaintiffs initiated this suit just over eight months later on August 7, 2022, in the Judicial District of New Haven of the Superior Court of Connecticut. See Notice of Removal (Doc. No. 1). Yale removed the action to this court on September 14, 2022. Id. Yale moved to dismiss Counts Four and Five of the plaintiffs' Complaint on September 20, 2022. See Partial Mot. to Dismiss.

For the reasons set forth below, the court grants in part and denies in part Yale's Partial Motion to Dismiss.

### III.    STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 2(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor. See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020). However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678.

**IV.     DISCUSSION**

      A.     <u>Equal Protection and Due Process</u>

In Count Four, the plaintiffs claim that Yale's conduct violated the Due Process and Equal Protection Clauses of the United States and Connecticut Constitutions. <u>See</u> Compl. at 4, ¶ 21.  In order to subject private actors to liability for violations of the Fourteenth Amendment, their actions must be attributable to the state.  <u>See</u> <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295-97 (2001).  The Supreme Court has "identified a host of facts that can bear on the fairness of such attribution." <u>Id</u>. at 296.  To name just a few examples, [the Court has] held that a challenged activity may be state action when it results form the state's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or cover,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents.'" <u>Id.</u> (internal citations omitted).  Accordingly, no single test has emerged to determine who is a state actor or what conduct constitutes state action. <u>See</u> <u>id.</u> at 296-97.

The only allegation in the Complaint that implicates state action is the plaintiff's claim that Yale receives federal funds and participates in federal programs.  <u>See</u> Compl. at 1, ¶ 5.  Nonetheless, Yale essentially argues that, even if plaintiffs had proffered alternative claims, the University would not be deemed a state actor for the purposes of the Fourteenth Amendment.  <u>See</u> Mem. at 9-15.  The University significantly relies on <u>Hack v. President & Fellows of Yale Coll</u>., where this court concluded that: (1) Yale was not a state actor under the test set forth in <u>Lebron v. National R.R. Pass. Corp.</u>, 513 U.S. 374 (1995); (2) Yale's status as a recipient of state and federal funding, alone, was insufficient for its conduct to constitute state action; and (3) the University's housing

4

policy at issue "[could] not fairly be attributed to the State of Connecticut" under the public function analysis. See Mem. at 9-15 (citing 16 F. Supp. 2d 183 (D. Conn. 1998), aff'd, 237 F.3d 81 (2d Cir. 2000)). Yale argues that all three grounds are dispositive in the instant case.[1]  See Mem. at 10-15.

In their Objection, the plaintiffs principally object to Yale's reliance on the first and third Hack grounds above. See Obj. at 5-12. Because the plaintiffs do not argue that Yale is a state actor based on receipt of federal funds, and it is well settled that, that this alone is insufficient under the state action doctrine, this court focuses its analysis on whether Yale is a state actor under the Lebron and "public function" tests. See Horvath v. Westport Library Ass'n, 362 F.3d 147, 152 (2d Cir. 2004) (discussing Rendell-Baker v. Kohn, 457 U.S. 830 (1982)).

    1. Lebron Test

In Lebron v. National R.R. Pass. Corp., the Supreme Court held that where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." 513 U.S. at 400. "Following Lebron, we have utilized the [three-

---

[1] Yale notes that state action is also required under the Equal Protection and Due Process Clauses of the State's Constitution. Id. at 6-7 (first citing Savage v. Aronson, 214 Conn. 256, 284 (1990); and then citing Lockwood v. Killian, 172 Conn. 496, 501 (1977)). The University does not otherwise provide distinct or separate arguments in favor of dismissing the state constitutional claims.

Connecticut and other state courts typically follow the federal state action doctrine. Cf. United Food & Commercial Workers Union, Local 919, AFL-CIO v. Crystal Mall Assoc., L.P., 270 Conn. 261, (2004). Although the Connecticut Supreme Court has not "foreclose[d] the possibility that a proper interpretation of the Connecticut constitution could lead to the conclusion that [Connecticut's] state action requirement is more expansive than its federal counterpart", it "le[ft] for another day the determination of the exact contours of [Connecticut's] state action doctrine." 290-91 (2004). Since Crystal Mall Assoc., this court is not aware of any state decisions that have addressed whether the Connecticut's state action doctrine differs from its federal counterpart. Thus, this court's analysis of whether Yale's conduct constitutes state action disposes of both the state and federal constitutional claims in Count Four.

5

prong] standard to determine whether or not a corporate entity qualifies as a state actor . . . for the purposes of the state action requirement." Horvath, 362 F.3d at 153 (quoting Hack, 237 F.3d at 84). The Lebron test thus determines whether a nominally private entity is a government actor subject to liability under any provision of the Constitution. See, e.g., id.; Parrett v. Southeastern Boll Weevil Eradication Foundation, Inc., 155 Fed. App'x. 188, 191-92 (6th Cir. 2005) ("Lebron identifies three major questions necessary to determine whether a private corporation is an arm of the federal government for purposes of federal constitutional challenges…").

Turning to the case at bar, Yale argues that "Hack's analysis under the Lebron test remains instructive" as facts relevant to the creation and governance of the University have not changed. See Mem. at 13. As it did in Hack, Yale concedes that it satisfies the first two elements—the State of Connecticut created it by special law in furtherance of governmental objectives—but contends it is not a state actor because only two of the nineteen seats on its governing board consist of state officials and neither official retains authority to appoint a majority of seats. Id.

The plaintiffs counterargue that this court should not strictly adhere to Hack. See Obj. at 9-12. The plaintiffs contend that Horvath expressly rejected Lebron's third prong; therefore, the fact that state officials only comprise two of nineteen seats on Yale's governing body should not preclude a finding of state action. See Obj. at 10-11.

In its Reply, Yale asserts that the plaintiffs' reliance on Horvath is misplaced given that Hack is directly on point. See Reply at 2-3. The University argues that Richardson v. Hartford Pub. Library, 969 F. Supp. 2d 237 (D. Conn. 2013), "significantly undercuts" Horvath's holding. Id. at 3. Furthermore, Yale notes that the plaintiffs

cannot rely on two cases they cite in their Objection—Becker v. Gallaudet Univ., 66 F. Supp. 2d 16 (D.C.C. 1999) and Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545 (2d Cir. 2001)—because the plaintiffs either fail to meet the tests articulated in these cases.

The court need not address Yale's Reply arguments because the plaintiffs' interpretation of Horvath is flawed. In Horvath, the Second Circuit held that the Westport Library was a state actor under Lebron. 362 F.3d at 153. Although the Town of Westport only had power to appoint half of the trustees, the court concluded the third prong was satisfied in light of the pervasive entwinement between the Library and the government. Id. Key to Horvath's conclusion that the Library was a state actor was the Library's substantial financial dependency on the Town. Id. ("The additional fact that only a little more a tenth of the Library's funding comes from other sources . . . convinces us that the Town maintains sufficient control over the Library"). This is far from a rejection of Lebron, as the plaintiffs argue. Rather, Horvath holds that, in order to satisfy the Lebron test, the State need not retain permanent authority to appoint a majority of a private actor's governing board, if there is pervasive entwinement between the State and the private actor. Id. And the Supreme Court has long held that pervasive entwinement signifies that a private actor and the State have "largely overlapping identit[ies]." Brentwood Acad., 531 U.S. at 299-303 (finding state action where public officials control and "overwhelmingly perform all but the purely ministerial acts by which the [private institution] exists and functions"); cf. Rendell-Baker, 457 U.S. at 840-41 (holding that acts of a school, like those of "private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or

submarines for the government . . . do not become acts of the government by reason of their significant or even total engagement in performing public contracts").

Here, the plaintiffs have not shown that University satisfies Lebron as originally articulated or as supplemented by Horvath. Yale asserts the salient facts have not changed since 1998, when Hack was decided. See Mem. at 13 (noting state officials still only constitute two of the nineteen seats on Yale's current board of trustees); Reply at 3. The plaintiffs have neither provided evidence to the contrary nor argued that the State retains permanent authority to appoint a majority of the board. Furthermore, while the plaintiffs do not assert that Yale satisfies Horvath, such an argument would be unavailing given the alleged facts. Crucially, using Yale as a point of comparison, the Horvath Court noted that the University "was a 'long way from [being] control[led]' by the state." 362 F.3d at 153 (quoting 237 F.3d at 84)). Indeed, the State's authority to appoint two of nineteen trustees is far from the Town of Westport's authority to appoint fifty percent of the Westport Library's Board. Moreover, the plaintiffs do not allege or argue pervasive entwinement between the State and Yale. Therefore, in light of the Hack decision, the court concludes as a matter of law that Yale does not satisfy the Lebron test.

2. Public Function

Yale also argues that receiving federal funds and participating in federal programs also does not confer state actor status on it under the "public function" test. See Mem. at 13-15. To satisfy the public function test, "[p]rivate actors must be delegated functions that were traditionally under the exclusive authority of the state." Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 259 (2d Cir. 2008); see also Horvath, 362 F.3d at 151("State action may be found in situations where an

8

activity that traditionally has been exclusive, or near exclusive, function of the State has been contracted out to a private entity."). In Horvath, the Second Circuit held that the Westport Library is not a state actor under the public function analysis because, although providing library services tend to be within local government's purview, it is not a function that has exclusively been within the State's authority. 362 F.3d at 152 (citing Hollenbaugh v. Carnegie Free Library, of Connesville, Pa., 545 F.2d 382, 383 (3rd Cir. 1976)). In the same vein, in Hack, this court held that Yale's housing policies may benefit the State, but this alone does not satisfy the public function test. 16 F. Supp. 2d at 192. In contrast, policing functions typically satisfy the public function test because "only the State may legitimately imprison individuals as punishment for the commission of crimes." Horvath, 362 F.3d at 151-52.

Although the plaintiffs do not explicitly invoke the public function analysis, they make two arguments that emphasize the specific context of the instant case. See Obj. at 11-12. First, the plaintiffs contend that Hack is distinguishable because, in this case, notwithstanding "[i]ts location in the heart of New Haven," the University has "made a global decision about the lesser capability of minority contractors and employees, and expressed its distaste for, and prejudice against minority persons"; whereas Hack concerned a school administrative policy about student housing. Id. at 11. Second, the plaintiffs argue that Yale is a state actor because, in a prior case, Yale did not contest that "the university is performing state action through its police department, which performs a governmental policing function and has arrest authority." See Obj. at 12 (discussing Washington v. Eaton, No. 3:20-cv-1111, 2021 WL 3291658, at *20-21 (D. Conn. Aug. 2, 2021)).

9

Yale responds that the plaintiffs' assertion disregards that a private actor's conduct can be deemed state action in limited contexts even if it is not considered a state actor for all purposes.  See Reply at 6-7 (citing Nelson v. Yale Univ., 2005 WL 1089168, at *2 (Conn. Super. Ct. Apr. 5, 2005)).  The University further notes that the plaintiffs' argument that Yale's conduct has a broader reach in the instant case does not satisfy any state action tests.  See Reply at 4-6.

Here, Yale's alleged discriminatory conduct took place in the context of a breach of contract, a quintessential private commercial activity.  Thus, plaintiffs' reliance on Washington v. Eaton, where actions by Yale's Police Department were at issue, is misplaced.[2]  Moreover, even if the contract's subject matter—snow and ice removal—is considered a public service, it is not a traditional or exclusive state function. Municipalities in Connecticut have previously been held liable for injuries resulting from dangerous sidewalks.  See, e.g., Cusick v. City of New Haven, 148 Conn. 548 (1961) (discussing municipal liability for icy sidewalks); Shroeder v. City of Hartford, 104 Conn. 334 (1926) (same).  However, they can adopt ordinances that require property owners to remove snow and ice on sidewalks and transfer liability to property owners for damages resulting from injuries on snowy or icy sidewalks abutting private property. See Conn. Gen. Stat. §§ 7-148, 7-163a.  Snow and ice removal are thus not functions that have exclusively been within the authority of the State. Therefore, under the public function test, Yale's alleged conduct does not constitute state action.

---

[2] Importantly, Yale police have the authority, granted by the State, to arrest individuals.  Eaton, 2021 WL 3291658, at *2 n.2.

10

Because the plaintiffs have failed to state facts that plausibly allege that Yale is a state actor or that the action at issue is a public function, the Motion to Dismiss the constitutional violations in Count Four is granted.

B.     Intentional Infliction of Emotional Distress

Yale also moves to dismiss Count Five, arguing that the plaintiffs fail to state a legally sufficient claim for intentional infliction of emotional distress.  See Mem. at 16. For the reasons discussed below, the court grants in part and denies in part the Motion to Dismiss this claim.

1. N.E.S.A.I.M.

As to N.E.S.A.I.M., Yale argues a corporate entity cannot state a claim for intentional infliction of emotional distress because it cannot experience distress.  See Mem. at 16.  N.E.S.A.I.M. does not offer any arguments to the contrary.

Although there are no known cases within this Circuit or State that address this issue, "[m]any courts have held that a business entity cannot recover damages for emotional distress as a matter of law, on the rationale that entities cannot 'experience emotions.'" Dan B. Dobbs et al., The Law of Torts § 381 (2d ed.) (citing Osprey Cove Real Estate, LLC v. Towerview Construction, LLC, 343 Ga. App. 346, 808 S.E.2d 425 (2017)); see, e.g., Dynamic image Techs., Inc. v. United States, 221 F.3d 3, 72 n.2 (1st Cir. 2000) ("Because corporations, unlike natural persons, have no emotions, they cannot press claims for intentional infliction of emotional distress."); F.D.I.C. v. Hulsey, 22 F.3d 1472, 489 (10th Cir. 1994) ("Since a corporation lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress."); Lampliter Dinner Theater v. Liberty Mut. Ins. Co., 792 F.2d 1036, 1039 n.2 (11th Cir. 1986)

11

("[C]orporations cannot experience emotional distress and cannot therefore maintain a suit for outrageous conduct.").

This court finds this authority persuasive.  Further, the plaintiffs did not address this aspect of the Motion to Dismiss and therefore are deemed to have abandoned N.E.S.A.I.M.'s claim.  See Leal, Inc. v. Twin City Fire Ins. Co., 473 F. Supp. 3d 648, 660 (D. Conn. 2021).  Thus, as to N.E.S.A.I.M., the Motion to Dismiss the intentional infliction of emotional distress claim is granted.

### 2. Mr. Howell

Yale moves to dismiss Count Five as to Mr. Howell on the grounds that he does not adequately allege the requisite elements for an intentional infliction of emotional distress claim.  In Connecticut, in order to state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant intended to inflict emotional distress or knew or should have known that distress was likely to result; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff's distress; and (4) the plaintiff's emotional distress was severe.  Appleton v. Bd. of Ed. of Town of Stonington, 254 Conn. 205, 210 (2000).  Yale argues that Mr. Howell fails to allege or imply that (1) Yale intended to cause him emotional distress or knew or should have known that emotional distress was likely to result; and (2) as a matter of law, Yale's alleged actions do not constitute extreme and outrageous conduct.  See Mem. at 16.

#### a.  Yale's Intent

Yale's argument regarding Mr. Howell's failure to allege Yale's intent is premised on this court's recent decision in Morgan v. Semple.  See Mem. at 19 (citing No: 3:16-cv-225, 2020 WL 1974381, at * 23 (D. Conn. Apr. 24, 2020)).  Yale emphasizes that, in Morgan, this court dismissed the intentional infliction of emotional distress claim

12

because the plaintiff failed to "allege[] any conduct that was directed at him or intended to inflict[] emotional distress upon him." Mem. at 19 (citing Morgan, 2020 WL 1974381, at * 23.).

In Morgan, the plaintiff asserted an intentional infliction of emotional distress claim against supervisory defendants for failing to act to prevent problematic conduct under a theory of supervisory liability. 2020 WL 1974381, at *22-23. This court dismissed the intentional infliction of emotional distress claim only as to the supervisory defendants because the Complaint only alleged that the supervisors failed to take any action to stop the other named defendants' alleged retaliation and harassment.[3] 2020 WL 1974381, at *22-23; see, e.g., Brownville v. Indian Mountain School, No. 3:1-cv-1472, 2017 WL 3726467, at *5 ("Connecticut courts have accordingly regularly held that nonfeasance, failure to investigate, or permitting conduct to continue does not support claims of IIED."). In the case at bar, Mr. Howell alleges affirmative conduct, attributable to Yale under agency liability. See Compl. at ¶¶ 9-21.

Moreover, Mr. Howell is not required to explicitly allege Yale's state of mind when it can plausibly be inferred from the factual allegations. See Biro v. Cande Nast, 807 F.3d 541, 544-45 (2d Cir. 2015). In Iqbal, "the Supreme Court held that 'Rule 9(b) requires particularity when pleading fraud or mistake, while allowing malice, intent, knowledge, and other conditions of a person's mind to be alleged generally,' but 'does not give [a plaintiff] license to evade the less rigid—though still operative—strictures of Rule 8." Id. (quoting Iqbal, 556 U.S. at 686-87). At the pleading stage, the plaintiff need

---

[3] As this court emphasized, "the remaining Defendants [did] not move[] to dismiss their claim." 2020 WL 1974381, at *23.

13

only detail sufficient facts to allow courts to plausibly infer the requisite state of mind from the allegations. See Biro, 804 F.3d at 545.

The court thus rejects Yale's contention that Mr. Howell fails to imply that Yale intended to inflict emotional distress or that it knew or should have known emotional distress was likely to result. The affirmative and direct nature of Mr. Signore's actions are particularly critical in rendering the necessary intent plausible. If, instead, Mr. Howell had separately discovered Mr. Signore's decision to terminate their contract was motivated by racial animus, then the instant case would be more akin to the numerous cases cited by Yale in its Memorandum, see Mem. at 22, where Connecticut courts have held that adverse employment action, even if wrongfully motivated, cannot support a claim for intentional infliction of emotional distress. See p. 16, infra; see also Armstead v. Stop & Shop Cos., Inc., No. 3:01-cv-1489, 2003 WL 1343245, at * 4 (D. Conn. Mar. 17, 2003 (collecting cases). As discussed more in depth infra, see pp. 16-17, courts must evaluate the defendant's conduct, not motives, when assessing an intentional infliction of emotional distress claim on a motion to dismiss. When the defendant verbally expresses its discriminatory motive, that public expression and the statements are the conduct the court scrutinizes.

However, it is rational to infer from the alleged circumstances that a reasonable person in Mr. Signore's position likely knew or should have known that directing such racially derogatory statements at a Black individual would cause distress. Therefore, Mr. Howell has sufficiently alleged Yale's intent.

    b.  Extreme and Outrageous Conduct

Yale additionally moves to dismiss the intentional infliction of emotional distress claim on the ground that its alleged conduct is not sufficiently extreme or outrageous as a matter of law.  See Mem. at 20.

Mr. Howell counters that, whether Yale's alleged conduct is extreme and outrageous, is a question of fact for the jury to determine.  See Obj. at 13-14, 18.  Nonetheless, he provides a survey of cases where Connecticut courts and other jurisdictions found the conduct at issue sufficiently extreme and outrageous to argue that a "very wide range of human interaction . . . can withstand a motion to dismiss." Id. at 14-18.

As an initial matter, Mr. Howell misconstrues the court's role.  "Whether conduct may be 'reasonably regarded' as extreme and outrageous is a question, in the first instance, for the court."  Huff v. W. Haven Bd. of Ed., 10 F. Supp. 2d 117, 123 (D. Conn. 1998).

> [I]n assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function.  In this capacity, the role of the court is to determine the allegations of a complaint, counterclaim or cross complaint set forth behaviors that a reasonable fact finder could find to be extreme or outrageous.  In exercising this responsibility, the court is not fact finding, but rather it is making an assessment whether, as a matter of law, the alleged behavior fits the criteria required to establish a claim premised on intentional infliction of emotional distress.

Hartmann v. Gulf View Estates Homeowners Ass'n, Inc., 88 Conn. App. 290, 295 (2005).  See also Strano v. Azzinaro, 188 Con. App. 183, 188 (2019); Historic District Comm'n v. Sciame, 140 Conn. App. 209, 218 (2013).  Thus, contrary to Mr. Howell's position, this court's initial function is to determine whether Yale's alleged conduct is extreme and outrageous as a matter of law, such that the claim should proceed.

15

Turning to the main issue, the court finds that Mr. Howell alleges conduct that is sufficiently extreme and outrageous.  "Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Appleton, 254 Conn. at 211; see also Maselli v. Regional Sch. Dist. No. 10, 198 Conn. App. 643, 615 (2020).  In the employment context, employees are expected to tolerate a certain level of distress or stress in the workplace, thus, the bar for conduct to be considered extreme and outrageous is higher.  See Perodeau v. Hartford, 259 Conn. 729, 757 (2002).  Consequently, courts have routinely dismissed claims based on allegations of unfair disciple, ridicule, taunts, and even harassment. See McCalla v. Yale Univ., No. 3:17-cv-1044, 2017 WL 4870908, at * 4 (D. Conn. Oct. 26, 2017).  Moreover, as Yale correctly notes, courts have even dismissed such claims as insufficiently extreme and outrageous when plaintiffs alleged discriminatory intent or motive.  See Mem. at 22 (citing Huff, 10 F. Supp. 2d at 123; Robinson v. New Haven, 578 F. Supp. 2d 385, 391 (D. Conn. 2008); Allen v. Egan, 303 F. Supp. 2d 71, 78 (D. Conn. 2004); Reho v. Sacred Heart Univ., Inc., 2017 WL 104998, at *4 (D. Conn. Mar. 15, 2017); Armstead, 2003 WL 1343245).

However, there is an important distinction between situations where employment decisions were motivated by alleged discriminatory intent and situations where employers directed discriminatory comments to plaintiffs or articulated their racial motives.  Cf. McCalla, 2017 WL 4870908, at *5; Credle-Brown v. Connecticut, 502 F. Supp. 2d 292, 300 (D.Conn. 2007), adhered to on reconsideration, 246 F.R.D. 408 (D. Conn. 2007).  "[C]laims of employer misconduct in the form of intentional discrimination

16

or retaliation, including discharge, which challenge motive or intent, are dismissed unless the manifesting conduct is itself outrageous or extreme." Credle-Brown, 502 F. Supp. 2d at 300 (quoting Armstead, 2003 WL 1343245, at *5).  In Lamothe v. Russell, the Superior Court examined several Connecticut cases in which motions to strike were denied because the "supervisor's discriminatory comments to an employee based on the employee's race, religion, or ethnicity, could be considered extreme and outrageous conduct."  No. CV07-4022729S, 2009 WL 1057965, at *3 (Conn. Super. Ct. March 25, 2009).  Notably,  the cases Lamothe examined "all share as common threads conduct that took place in an employment context, where the tormentor was the employee's supervisor, who made derogatory comments to or about the plaintiff directly corresponding to the plaintiff's race or ethnicity."  Id.  Furthermore, the Lamothe court also specifically distinguished its facts from those present in Morrissey v. Yale Univ., 268 Conn. 426 (2004), where the court concluded that the disparaging comments about the plaintiff were not extreme and outrageous because they "were not directed to her by her supervisor or employer, but rather, by a co-worker's boyfriend."  Id., at *5.

      Here, the plaintiffs allege far more than taunts or hurtful comments.  The Complaint includes allegations that Mr. Signore expressed negative racial stereotypes directly to Mr. Howell, a Black contractor.  See Compl. at 2-3, ¶¶14-17; see also, supra, at p. 2.  Moreover, the plaintiffs further allege that Mr. Signore indicated directly to Mr. Howell that the contract repudiation was motivated by racial discrimination.  Id. at ¶¶18-19.  Thus, the plaintiffs' allegations regarding Yale's actions plausibly give rise to allegations of extreme and outrageous conduct.

17

Therefore, Yale's Motion to Dismiss the intentional infliction of emotional distress claim as to Mr. Howell is denied.

## V.     CONCLUSION

For the reasons stated above, Yale's Partial Motion to Dismiss (Doc. No. 12) is granted in part and denied in part, without prejudice to repleading, if the plaintiffs can plausibly allege causes of action consistent with this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 26th day of September 2023.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge