UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HOWELL, TODD
Plaintiff

Case 3:22cv1160 (JCH)

v.

YALE UNIVERSITY
Defendant

## AFFIDAVIT OF TODD HOWELL

1. My name is Todd Howell and I am over the age of eighteen. I know and understand the importance of an oath. I make the following statements under oath.

2. I am the sole owner of a company called NESAIM LLC.

3. I make this affidavit to supplement the testimony that I gave under oath at the time of my deposition on September 12, 2024 because the attorney for Yale who was taking my deposition stated that he was not closing the deposition but only suspending it. Therefore my attorney did not get to question me with regard to follow up of some matters related to this current lawsuit.

4. At the meeting with Joseph Signore he stated outright that he did not like to work with Black or minority contractors because of his past experiences. He further stated that I was lucky that he did not cut me out of contracting work completely with Yale. Instead he was allowing only a reduced contract for about one-fourth of what had been agreed to.

5. I also had a telephone call from Yale supervisor Paul Catalano. He called my cellphone mistakenly thinking that he was speaking with Charles Fetters, the Caucasian male co-owner of AGCT.

6. Catalano stated that Signore can't stand me and had "been keeping [me] out of working for Yale for 17 years". He then recommended that I not be brought in to show any affiliation with AGCT [the company that he thought he was talking to].

7. This telephone call took place approximately a week to ten days before the pre-bid meeting at which Signore stated his dislike of Black contractors.

1

8.  The medical records that were produced by Stony Creek Wellness were definitely not indicative of the therapy sessions that I had. The written records relate only to the staff person who handled my medication management, which was Tricia Mignosa, APRN. She was not the therapist with whom I discussed emotional and mental health issues. That was Jody Farrell.

9.  During the therapy sessions that I had with Jody, I do not recall seeing her taking any handwritten notes or notes in the computer, at least not during our session times.

10. I did exchange pleasantries in text messages with Joseph Signore after the blatantly racist statements that he made to me. That does not mean that I ignored his comments or did not feel serious distress over those comments. It is a fact of life for African Americans that we regularly have to engage in code switching. That is, we have to engage in adaptive behaviors as a strategy to navigate relationships with Whites, especially those who display power over us.

11. Signore's dislike of Blacks like myself had already been demonstrated when it was strong enough to cause a second Yale supervisor to call someone that he thought had power over me to advise them not to have me affiliated with the company (i.e. AGCT).

12. I was also aware that in the contracting world, one can easily be blacklisted, especially by a large entity like Yale, resulting in even further damage reputation ally and economically.

13. It was never my practice to discuss my personal business such as emotional or mental health issues with anyone, including Charles Fetters and Andrea Wolfe. They are both Caucasians and usually just don't have much empathy believing that Blacks do not have much cause for concern about discrimination. The fact that Fetters failed to "hear" the horrible statements made by Signore at the November 2019 pre-bid meeting is evidence of that. Furthermore, although Ms. Wolfe and I had previously had a close personal relationship, because of a serious motor vehicle accident, she has struggled with memory issues.

14. The Stony Creek Wellness therapist that I met with was Jody Farrell. I met with her in person once or twice a week during the period from April 2018 (because of the seriousness of my congestive heart failure) until around December 6, 2021. At this time Jody expressed to me that she used to be a paralegal and did not really want to be involved in anything legal. By this time she was aware that I was going to file a lawsuit. These sessions lasted 50 to 60 minutes. In this time period (November 2019 through December 2021) I had some 40 or more sessions with Jody. I admit that some of my session discussions included discussion of my on-going medical conditions but also were overmuch about the emotional distress that I felt as a result of the Signore/Catalano/Yale discrimination. I was also distressed that even after learning of Signore's

2

statements, no one in Yale upper management ever reached out to me or disavowed anything said by Signore.

15. I did not ever see Jody taking any handwritten notes or entering anything into the computer during our sessions. This probably accounts for why all of the records produced by Stony Creek during the discovery of this matter relate only to the medication management staff notes.

16. I absolutely did discuss with Jody the emotional impact on me of the Yale supervisors (Signore and Catalano) discriminating against me as an African American.

17. The impact on me emotionally of the Yale discrimination was that I felt depression knowing that for all these 17 years when I had been making every attempt possible to be positioned to obtain Yale contracting opportunities only to find out that my race had kept me from doing so.

18. I felt great hopelessness because if it had been a matter of lack of qualifications or skill that is something that I could correct. However, I could not do anything to change the melanin in my skin so I was left feeling that it was hopeless to even try.

19. I felt a deep sense of sorrow because, for all these years, I had been hoping that it was not my race that was keeping me back, only to find out that race was indeed the culprit. I was very sorrowful because, a large institution like Yale that touts itself as an equal opportunity employer, not engaging in racial discrimination was actually doing the opposite of what they said in all their postings.

20. I felt a deep sense of fatigue, downtrodden, because over those many years I had made calls, sent emails, spoke with the supervisors and managers at Yale, including Chris Brown, the head of community relations for supplier diversity, I had attended many walk through meetings on site to be prepared for the bidding process ad all of this had been to no avail.

21. I felt damaged in my reputation because there had been many occasions when other contractors had seemed to scorn or shun me, wanting to know what I had done to cause Yale to not utilize me even while using other contractors that were clearly not as qualified as me. I felt worse than I had previously, and humiliated because it was now apparent that all these years there had been deliberate smearing of my reputation by agents of Yale. This is huge for anyone in the New Haven vicinity who wants to engage in contracting.

22. I used to question myself Is it me, my company, did I offend someone. It didn't make sense that I had been intentionally held back by Yale. I was devastated. This kind of thing makes you think you are not good at what you do, makes you feel not qualified, made me feel worse because my life financially was being held back.

3

23. It was emotionally traumatizing to me to know that I was being bad-mouthed to any untold number of people.

24. I also had insomnia for a period of time starting right after the phone call that I received from Catalano. It definitely worsened after Signore made his openly racist statements to me in the presence of other people. This sleeplessness continued for about a year and then diminished. However once the lawsuit and being involved in discovery, depositions, and the very poor manner that my prior attorney handled this case caused the sleeplessness to flare up again.

25. Defendant's attorney has brought up a statement that I made during a hearing before Magistrate Farrish where I stated that I was not "mentally destroyed." To me "mentally destroyed" is one emotional state on a spectrum. Destroyed is where someone may suffer a nervous breakdown. Certainly I never claimed that. However on the spectrum of emotional states, this was serious enough that I engaged in therapy over it to help me cope.

26. Although Joseph Signore apparently harbored strong dislike and racial animus toward me (because of the mulch case) on the 17 years leading up to the November 2019 meeting, I did not harbor any animus or hostility toward him.

27. I note that Defendant's counsel has tried to subtly suggest that Carlos Arroyo testified the way that he did because he "does what I tell him to". When Carlos made this statement in his deposition he was talking about the work tasks that I gave him to perform. I never asked Carlos to lie for me or to make anything up regarding what he heard in the November 2019 meeting. Not even my own present attorney discussed with Carlos what he was going to say prior to his deposition.

4

Further affiant safety not.

_Todd Howell_

Sworn to and subscribed before
Me this 20th day of December 2024

_Commissioner of the Superior Court_

# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF CONNECTICUT
 2
                                        )
 3    TODD HOWELL, ET AL.,              )  No. 3:22-CV-01160-JCH
                                        )  141 Church Street
 4                  vs.                 )  New Haven, Connecticut
                                        )
 5    YALE UNIVERSITY.                  )  June 30, 2023
                                        )
 6    _____

 7              TRANSCRIPT OF MOTION HEARING

 8         BEFORE THE HONORABLE THOMAS O. FARRISH
               UNITED STATES MAGISTRATE JUDGE
 9
      APPEARANCES:
10    For the Plaintiffs:    WILLIAM S. PALMIERI, ESQ.
                             Law Offices of William S. Palmieri,
11                           LLC
                             110 Whitney Avenue
12                           New Haven, CT 06510

13    For the Defendant:     KEVIN C. SHEA, ESQ.
                             The Law Offices of Clendenen & Shea,
14                           LLC
                             400 Orange Street
15                           New Haven, CT 06511

16

17

18    ECR Operator:          COURTSMART

19                           Tiffany Miller
                           7227 N. 16th Street
20                              Suite 207
                           Phoenix, AZ 85020
21                           (800) 257-8885

22

23

24

25
```

30

Colloquy

1  who pays it?

2         THE PLAINTIFF:  We're going to have to, Your Honor,
3  because it's an order of the Court.  But what I do want to say
4  is that I have -- I feel that I have ineffective counsel, and
5  this is why I'm speaking to other attorneys.  I have produced
6  so much stuff.  I was under the impression when we left this
7  courtroom last time, layman terms, that Attorney Shea,
8  Palmieri, and myself, we got together, sit down.  I bring my
9  laptop.  I have nothing to hide.  The only thing about medical
10 records, it was a question he asked.  Was I seeing anybody
11 during that time?  I didn't say I was like, oh, you know,
12 mentally destroyed over it.  (Indiscernible) was the same
13 therapist that I had always been going to.  I said, you have
14 those records.  Send it to him.

15        I don't -- I'm not sitting here -- you know, I'm
16 answering these questions as a layman to the best that I can.
17 And I'm not claiming medical damages.  I don't care.  I'm --
18 this is business.  I got my big boy pants on.  I've been doing
19 this forty years, and for the bulk of that, I dealt with a lot
20 of discrimination.

21        But to have somebody tell me to my face and then to
22 see -- their attorney's doing their job, try to get it
23 dismissed on this and that.  And then I feel that I'm
24 providing the information to my attorney.  He's the conduit to
25 Attorney Shea and to the Court, and it's not getting

Colloquy

1   disseminated. And I can't communicate, and I don't know
2   what's getting sent.
3           THE COURT: All right.
4           THE PLAINTIFF: I'm getting penalized for that.
5           THE COURT: Well, Mr. Howell, if you have
6   dissatisfactions with your current representation, I'll leave
7   that to you to try and talk it through with Mr. Palmieri or
8   talk to other attorneys about it. The one thing I will say,
9   just so you can plan accordingly, is that the Court is not
10  likely to press the pause button on --
11          THE PLAINTIFF: Um-hum.
12          THE COURT: -- the case while you get this all sorted
13  out. Mr. Shea's entitled to his answers.
14          THE PLAINTIFF: Absolutely.
15          THE COURT: You guys have made a charge about Yale
16  University that if it's untrue, Mr. Shea, I'm sure, wants it
17  cleaned off of Yale's escutcheon as soon as it can possibly be
18  cleaned off, so we can't
19          THE PLAINTIFF: There's enough wit -- I'm sorry, Your
20  Honor.
21          THE COURT: We can't push the pause button on the
22  case for an extended period of time while you sort this out
23  with your lawyer, so --
24          THE PLAINTIFF: I -- I'm sorry, Your Honor.
25          THE COURT: All right. So here's what I'm inclined