# EXHIBIT B

### Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------x
TODD HOWELL,                  :
                              :
     Plaintiff    :
                              :
     -versus-        :CIVIL ACTION NO.
                     :3:22-CV-1160(JCH)
YALE UNIVERSITY,         :
                              :
     Defendant    :
---------------------------x

Deposition of TODD HOWELL, taken pursuant to Rule 30 of the Federal Rules of Civil Procedure, held at the law offices of CLENDENEN & SHEA, LLC, 555 Long Wharf Drive, 1st Floor, New Haven, Connecticut, before Julia Flynn Cashman, RPR, LSR 250 and Notary Public in and for the State of Connecticut, on Thursday, September 12, 2024, at 10:00 a.m.

### Page 2

1  A P P E A R A N C E S:
2
3      ATTORNEY FOR PLAINTIFF:
4      JOSEPHINE S. MILLER, ESQUIRE
       130 Deer Hill Avenue, Unit 13
5      Danbury, Connecticut  06810
       Jsmillerlaw@gmail.com
6
7
8      ATTORNEY FOR DEFENDANT:
9      CLENDENEN & SHEA, LLC
       555 Long Wharf Drive
10     New Haven, Connecticut  06511
       BY: KEVIN C. SHEA, ESQUIRE
11         Ksc@clenlaw.com
       JORDAN J. KOWALSKI, ESQUIRE
12         Jjk@clenlaw.com

### Page 3

1              STIPULATIONS
2
3   IT IS HEREBY STIPULATED AND AGREED by and between
4   counsel for the respective parties hereto that all
5   technicalities as to proof of the official
6   character before whom the deposition is to be
7   taken are waived.
8   IT IS FURTHER STIPULATED AND AGREED by and between
9   counsel for the respective parties hereto that the
10  reading and signing of the deposition by the
11  deponent are not waived.
12  IT IS FURTHER STIPULATED AND AGREED by and between
13  counsel for the respective parties hereto that all
14  objections, except as to form, are reserved to the
15  time of trial.
16
17              * * * * *

### Page 4

1   TODD HOWELL,
2   61 North Plains Industrial Road, Wallingford,
3   Connecticut  06492, having been first duly sworn
4   by Julia Flynn Cashman, a Notary Public in and for
5   the State of Connecticut, testified on his oath as
6   follows:
7   DIRECT EXAMINATION
8   BY MR. CLENDENEN:
9      Q. Good morning, Mr. Howell.
10     A. Good morning.
11     Q. I will reintroduce myself again on the
12  record.  We've met several times over the years,
13  but I am Kevin Shea, and with me here is our
14  associate, Jordan Kowalski.  We represent Yale
15  University in connection with a lawsuit that you
16  have brought against it in connection with a snow
17  removal contract.
18     Do you understand that we're here today for
19  your deposition in connection with that lawsuit?
20     A. Yes, sir, I do.
21     Q. Okay.  Have you been deposed before, sir?
22     A. Yes, I have.
23     Q. How many times?
24     A. Over a hundred.
25     Q. Over a hundred times, okay.  Why is that?

Page 21

1  discovery requests that have been marked as
2  Exhibit 2, is it your testimony that the truck had
3  already been stolen by that time?
4     A. Yes.
5     Q. Okay. And is it your testimony that your
6  computer had already been compromised by that
7  time?
8     A. I believe so. I would have to sit down and
9  chronologically look at that. But I remember
10 telling Attorney Palmieri about the truck, and I
11 remember telling him about the computer.
12    Q. Okay. Did you do anything to try and
13 collect whatever documents you could from anybody
14 else who might have them?
15    A. I did. But during this time period, I
16 was -- I had gotten sick again and my focus was on
17 my health. Because they were talking about doing
18 a heart transplant and this, in the priorities of
19 things that are going in my life at that moment,
20 had dropped down. This is important, but if I'm
21 not going to be around...
22    Q. I understand. But these responses were
23 revised and supplemented in April of 2024, by
24 which time that condition had improved and you
25 were out of the hospital; correct?

Page 22

1     A. Correct.
2     Q. Okay. So at any point between the time you
3  were served with these responses and the time you
4  served your -- question withdrawn.
5        At any time between the time you were served
6  with these requests and the time you provided your
7  supplemental responses, were you able to obtain
8  any of the missing information from any other
9  source?
10    A. I was able to glean some information from
11 older emails that I was able to access again. And
12 I did turn that over to the attorney when we did
13 the updated discovery.
14    Q. Did you ever ask Charles Fetters or Andrea
15 Wolfe if they had the documents?
16    A. They had documents related to AGCT. They
17 wouldn't have documents related to NESAIM.
18    Q. But AGCT was doing business as NESAIM for
19 purposes of this contract, correct?
20    A. Yes, but there's an underlying explanation
21 for that.
22    Q. What is that underlying explanation?
23    A. When the meeting we had with Joe Signore,
24 and he said all his racial epithets, attitude, "I
25 don't like Black contractors, I don't like Black

Page 23

1  people, I don't like you," he -- we had originally
2  four zones, 48 people. That's why I gave a price
3  of 45 dollars an hour to Sal. Sal was happy with
4  it.
5        You have to go through a vetting process to
6  become a Yale vendor. I contacted Sal right away,
7  I said "Sal, this guy is out of his mind." I said
8  "He's sitting here telling me he doesn't like
9  Black contractors, doesn't like me, went down a
10 list of names he'd like. If it was up to him, I'd
11 never work at Yale. He's been keeping me out of
12 working at Yale." And Sal said "Well, Todd we
13 need you. It's too late."
14       I said "Well, I'm working with and
15 consulting with this company AGCT." I said "Joe
16 seems to like them a lot better than me. How can
17 we work this out." He said "Well, they're not
18 going to get vetted." He said "The only way we
19 can do this," he goes, "change it around that it
20 says AGCT is doing business as." That way, AGCT
21 is the prime; they're able to allow us on campus.
22 Because I had been vetted as the NESAIM, the New
23 England Snow and Ice Management.
24    Q. But it had been your plan all along to use
25 AGCT for this contract, hadn't it?

Page 24

1     A. No, it had not.
2     Q. When did that come into play?
3     A. I was training Charles and Andrea, helping
4  them to mentor and build their business. I had
5  sent them to the pre-bid for the snow, and I asked
6  them to come to this pre-bid meeting. And during
7  the course of this pre-bid meeting, I had no idea
8  that Joe had this -- that's not true. I had found
9  out that Joe had this animosity and anger towards
10 me about a week or two earlier.
11    Q. How did you find that out?
12    A. I answered the phone one day and I said
13 "Hello," and it was Paul Catalano. And Paul said
14 "Hey, how you doing?" I said "Good, how are you?"
15 "This is Paul from Yale. Do you know a Todd
16 Howell?" I said "Yeah." He said "Do you know Joe
17 Signore?" I said "Yeah." He said "Well, Joe
18 can't stand Todd. He's been keeping him out of
19 working for Yale for 17 years. They had some
20 issue up at Pfizer. And so I would recommend you
21 not bringing Todd if he's affiliated with your
22 company in any way to this pre-bid meeting." And
23 I was like "Okay."
24       And I thought it was strange because it was
25 my phone. You know, I had never spoken to Paul,

Page 25

1  but it was interesting that I got that phone call
2  from Paul.
3    Q. And how soon before the November 29, 2019
4  meeting did that phone call occur?
5    A. About a week to ten days.
6    Q. A week to ten days. So by the 19th of
7  November?
8    A. Give or take a few days. I don't know
9  exactly.
10   Q. Okay. When is it that you believe Joe
11 Signore first became aware of your involvement
12 with NESAIM or AGCT?
13   A. At that meeting, Joe said "When I found out
14 it was you a few weeks ago, I did what I could to
15 keep you from getting any of the contracts. I
16 didn't want you on any of the contracts. I don't
17 want you working at Yale."
18   Q. He said that at the November 29, 2019
19 meeting?
20   A. Yes.
21   Q. Okay. Do you know how he found out that you
22 were involved?
23   A. He -- I don't want to speak the hierarchy of
24 Yale. Sal is the contracting administrator. At
25 the time, I think Joe was the supervisor. So he

Page 26

1  was not the administrator, but the implementer to
2  oversee the contract. He then reduced my contract
3  from four zones to one. And I questioned him at
4  that point, I said "How can you do that? It's not
5  your job to decide." And Joe proceeded to tell me
6  in that meeting that he could do whatever he
7  wanted and if I wanted to challenge him, I could
8  run it up the flagpole, and that I was lucky that
9  he even gave me one zone.
10   Q. Is there any evidence of which you are aware
11 of a contract between NESAIM and Yale that
12 involved four times the work that you ultimately
13 were doing?
14   A. With the original, it was a contract, it was
15 a purchase order, request order. It listed how
16 many men we were going to provide. I believe we
17 provided that to you, 48 people. And Joe reduced
18 that to 12.
19   Q. But when was that ever accepted by Yale?
20   A. Sal, Sal accepted it.
21   Q. How?
22   A. By signature, signed it.
23   Q. He signed it on behalf of Yale?
24   A. Yes, he did.
25   Q. Do you have a copy of it signed by Sal

Page 27

1  Garibaldi?
2    A. Yes.
3        MR. SHEA: I don't believe we received
4  that document. I would request that it be
5  produced.
6        MS. MILLER: You have it as D3 from
7  yesterday.
8        MR. SHEA: D3 from yesterday.
9        MS. MILLER: Mm-hmm. Do you want to
10 see?
11       MR. SHEA: Yes.
12       Oh, yes, I'm going to mark that today.
13 We'll get to that. Actually...
14       (DEFENDANT'S EXHIBIT 3 FOR
15       IDENTIFICATION Received and Marked.)
16   Q. Mr. Howell, I'm showing you now a document
17 that's been marked as Defendant's Exhibit 3 for
18 identification. Is this the document you were
19 referring to?
20   A. Yes.
21   Q. Where does this say that it's going to be
22 the number of men that you said it was going to
23 be?
24   A. I don't see it here. But I recollect there
25 was another page to this document that I don't

Page 28

1  have a copy of. Because we discussed how many
2  people I was going to have and what the best rate
3  he could give me -- that I could give him with
4  that amount of people. And my rate would have
5  been 60 if I had known. But he said "Well, what
6  if we do 48, you have the manpower to do 48
7  people." I said "Yes, I do."
8    Q. Who said that?
9    A. Sal.
10   Q. Okay. So first of all, this document that
11 we have marked as Defendant's Exhibit 3, is this
12 the contract that is at the center of your claims
13 in both this lawsuit and the recently filed
14 lawsuit in state court?
15   A. Yes.
16   Q. Okay. And who is this contract between?
17   A. Originally, it was between NESAIM and Yale.
18   Q. All right. Was this -- question withdrawn.
19      But you signed this contract on the second
20 page on behalf of AGCT d/b/a NESAIM, correct?
21   A. That was after we changed this up here as
22 well.
23   Q. And what date did you sign the contract?
24   A. According to this, the 23rd of November.
25   Q. Is that the 23rd of October?

Page 33

1  recognize them as an email and a map in connection
2  with the contract?
3     A. Yes.
4     Q. So if we look at Exhibit 3, the contract
5  itself, okay, you see written on the first page
6  are four areas: Berkeley North, Berkeley South,
7  Grace Hopper College and Cross Campus, correct?
8     A. I see those, but they were not on there
9  originally.
10    Q. Okay, but --
11    A. It's on there now.
12    Q. Yes. Are those the four areas that you were
13 assigned under this contract?
14    A. No. That is one area with four different
15 places inside of it.
16    Q. Okay. Do those four different places
17 correspond with the red area on the maps that are
18 attached as Exhibit 3B to the email that was
19 marked as Exhibit 3A?
20    A. When our contract was reduced by Joe
21 Signore, he reduced us down from four zones.
22 That's the key word, "zones;" not areas, colleges.
23 We had four zones. He reduced us to one zone.
24 Inside that zone, it obtained these four colleges.
25 We were supposed to be doing four times this area.

Page 34

1     Q. Okay. But am I correct to understand that
2  the four areas identified on the top of
3  Defendant's Exhibit 3 correspond with the red
4  areas marked on Exhibit 3B?
5     A. That he was -- yes, we were given -- these
6  were the areas, these were -- was paperwork he
7  sent us after he reduced our other areas.
8     Q. Okay. And you actually did perform snow
9  removal services in those areas for the winter of
10 2019 to 2020, correct?
11    A. No, I did not.
12    Q. Who did?
13    A. AGCT did.
14    Q. Why were you involved?
15    A. Because I promised Sal -- because I have
16 known Sal for a long time. He said "I'm nervous
17 about this AGCT company. They're going to --
18 we're going to" -- because it was short notice
19 because of the issues with Joe Signore. He said
20 "What we can do is set this up." He said "How are
21 you going to guarantee me that they'll do a good
22 job." I said "I'll work as a consultant
23 supervisor to make sure that this is done because
24 I know the level of work and know what you
25 expect." I said "I will be down there inspecting

Page 35

1  and making sure that this goes smoothly."
2     Q. Did NESAIM provide any employees whatsoever
3  in connection with that work?
4     A. No. Carlos ended up becoming an employee of
5  AGCT.
6     Q. But he testified yesterday that you paid him
7  cash.
8     A. Carlos was in a situation that -- first of
9  all, let me clarify, for the record, it is not
10 legal to pay somebody in cash.
11    Q. Well, he testified it was under the
12 table, --
13    A. No.
14    Q. -- as he understood.
15    A. He forced -- I don't want to argue with you.
16 But I gave him cash. If it was under the table,
17 he wouldn't have stated what he stated because I
18 claimed it on my taxes. He knew that. So he --
19 we paid him as a subcontractor, okay, an hourly
20 subcontractor. He claimed it on his taxes, as he
21 stated. So that eliminates under the table.
22    Q. How do you know he claimed it on his taxes?
23    A. He stated it yesterday right in front of
24 you.
25    Q. Did you look at his taxes?

Page 36

1     A. No, but he stated it here on a sworn
2  statement.
3     Q. He said he was on his own for his own taxes.
4     A. Correct. And he said he took the additional
5  money, added it to his taxes and filed his taxes.
6     Q. Were you employed by NESAIM?
7     A. No. I wasn't really working.
8     Q. Then why were you involved in the day-to-day
9  jobs on this?
10    A. Because I had finally gotten this
11 opportunity to work at Yale. It had been a long
12 time since I had worked there pre-Signore. I
13 wanted to make sure that this went 150 percent
14 well. Especially after this meeting of hearing
15 how Black contractors don't have this and don't
16 have that, and don't have the right equipment and
17 the right manpower. So I, on top of everything
18 else, wanted to make sure that this contract was
19 done correctly, supporting AGCT. Because it was a
20 company that I was involved as a consultant,
21 trying to help build that company up as a
22 Service-Disabled Veteran-Owned Small Business.
23    Q. Andrea Wolfe was your girlfriend at the
24 time, correct?
25    A. Yes, she was.

Page 37

1  Q. Were you involved in any other business
2  ventures with her besides the snow removal
3  services under this contract?
4  A. No, I was not.
5  Q. And well before that meeting at which Joe
6  Signore made the racial epithets that you allege
7  that he made, it had already been decided that the
8  work that AGCT doing business as NESAIM was going
9  to be doing under this contract, were just the
10 four sub areas within that one zone that you
11 described; correct?
12 A. Could you state that question again?
13 Because --
14 Q. Well, I'm having a hard time putting
15 together your theory about when and how and why
16 the zones were allegedly reduced as a result of
17 something that happened at this meeting or
18 knowledge that you were involved, when, as of at
19 least November 13th, Joe Signore is clearly aware
20 that you are involved. He has asked for your
21 contact information and he sends a map identifying
22 the areas that would be assigned to you; correct?
23 A. Correct.
24 Q. Okay. And that was well before the November
25 29, 2019 meeting, correct?

Page 38

1  A. If that's what the dates are saying. Joe
2  knew that -- as I stated earlier, Joe knew I was
3  involved as NESAIM He talked to Paul Catalano,
4  who called me and stated that Joe had an issue
5  with me. So Joe, even in that meeting, sat there
6  and said "For two weeks, I wasn't sure if I even
7  wanted anything to do with you because I don't
8  like Black contractors, I don't like you," he went
9  down this list.
10    Now, as far as these four things here, these
11 were -- there's another purchase order without
12 these items written on it, without the cross-out
13 for AGCT.
14      (DEFENDANT'S EXHIBITS 4 and 5 FOR
15       IDENTIFICATION Received and Marked.)
16 Q. Mr. Howell, I have showed you now two
17 documents that have been marked as Defendant's
18 Exhibits 4 and 5, which are respectively the
19 Complaint that you filed in connection with the
20 lawsuit we're here about today, and the Complaint
21 that was recently filed in Connecticut state court
22 on behalf of NESAIM; correct?
23 A. I haven't looked at that one yet. I'm still
24 looking through this one.
25 Q. Let's start on Exhibit 4. So you said you

Page 39

1  have seen this before, the federal complaint,
2  correct?
3  A. Yes.
4  Q. Okay. And first of all, on Paragraph 6,
5  where it says "On or about November 29, 2019, the
6  defendant Yale and the plaintiffs entered into a
7  contract." You see that?
8  A. Yes, I do.
9  Q. Okay. That contract that you're referring
10 to there is actually the contract that we have
11 marked as Defendant's Exhibit 3. Correct?
12 A. Correct.
13 Q. Okay. So then you see on Paragraph 13, --
14 A. Okay.
15 Q. -- which is actually preceded by Paragraph
16 9, these are both on page 2, Paragraph 9 says "On
17 or about November 29, 2019, plaintiffs and other
18 personnel met with the defendant in the
19 groundskeeper's office." Correct?
20 A. Yes.
21 Q. Okay. That's the meeting at which you claim
22 that Joe Signore made all the racial epithets,
23 correct?
24 A. Correct.
25 Q. And Paragraph 13, you state "At the November

Page 40

1  2019 meeting, Signore became aware that the
2  African American plaintiff, Todd Howell, was
3  involved with NESAIM and was involved with the
4  subject snow and ice removal contract." Correct?
5  A. Yes.
6  Q. Is that wrong?
7  A. Well, he was aware of it before, but he
8  stated -- he talked about that again in that
9  meeting.
10 Q. So --
11 A. I don't know the exact date internally that
12 he would have found out that I was involved.
13 Q. But you alleged in this lawsuit that we're
14 here about today that it was at that meeting that
15 he found out.
16 A. This is the information that I would have
17 passed on to the attorney and how he drafted it.
18 Q. Okay, well, then let's turn to the one that
19 was just recently filed in the past couple weeks,
20 which has been marked as Exhibit 5.
21 A. Can I read it?
22 Q. Sure. The relevant paragraphs are actually
23 the same exact paragraph numbers, Paragraph 9 and
24 Paragraph 13.
25      MS. MILLER: Actually, I would ask the

Page 41

1  witness to look at Paragraph 5 first before we get
2  to Paragraph 9.
3       MR. SHEA: Sure.
4       Q. Paragraph 5 makes reference to "On or about
5  October 31st, 2019, defendant and plaintiff
6  entered into a multiyear contract for the
7  provision of snow and ice removal services."
8  Correct?
9       A. Yes.
10      Q. Okay. And again, that contract that you're
11 referring to in Paragraph 5 on Exhibit 5 is the
12 contract that's been marked as Defendant's Exhibit
13 3; correct?
14      A. Yes.
15      Q. Okay. And then if you look at Paragraph 9
16 and Paragraph 13, again, it is repeated that it
17 was at the November 29, 2019 meeting that Mr.
18 Signore became aware that you were involved as the
19 principle owner of NESAIM; correct?
20      A. I can't speak for Mr. Signore.
21      Q. You did.
22      A. Okay. Well, then, he was aware of it before
23 and then as well.
24      Q. Okay. So the pleading is incorrect here, is
25 what you're telling me?

Page 42

1       A. No, it's not that it's incorrect.
2       Q. It says "at the meeting, he became aware."
3  And as a matter of fact, it's wrong. He was
4  already aware before the meeting, correct?
5       A. Correct.
6       Q. Okay. And before the meeting, it had already
7  been decided that either NESAIM or AGCT doing
8  business as NESAIM was going to be performing snow
9  removal services only in the areas identified in
10 Exhibit 3A and 3B; correct?
11      A. No.
12      Q. Then how do you explain the November 13
13 email specifying exactly that?
14      A. Please restate your question.
15      Q. Prior to the meeting dated November 29,
16 2019, at which you have alleged in your Complaint
17 that Joe Signore became aware that you were
18 involved with NESAIM and made those racial
19 epithets that you've alleged, it had already been
20 decided that AGCT doing business as NESAIM would
21 be providing snow removal services only in the
22 areas identified in Exhibits 3A and 3B; correct?
23      A. From what I read in this email, and what
24 you're showing me, because this email went to
25 AGCT, I was not always privy to all the

Page 43

1  conversations in the emails that AGCT and Joe
2  Signore had.
3       Q. This is an email you forwarded to your
4  former lawyer for production in this lawsuit,
5  correct?
6       A. Correct. But I got it it from AGCT, is what
7  I'm saying, okay? This was not directly to me.
8       Q. So do you have any reason to dispute the
9  fact that I am asking you about, that prior to the
10 November 29, 2019 meeting, at which you allege
11 that Joe Signore first became aware that you were
12 involved with NESAIM and made those racial
13 epithets, it had already been decided that AGCT
14 doing business as NESAIM would be performing snow
15 removal services under this contract, initially,
16 at least, only in the areas identified in Exhibits
17 3A and 3B?
18      A. As I stated earlier, Joe Signore said to me
19 face to face in that meeting that he had known for
20 weeks that we were involved and that I was
21 involved. And he was battling with not even to
22 give me work and reduced the work that we had.
23 How many weeks before that, I don't know. But
24 when he came in that meeting, he's like -- I said
25 "I'm supposed to be doing four zones." He said

Page 44

1  "No, you're lucky you're even getting one. I
2  wanted to give you half the zones." "Why?" And
3  that's, you know -- we can talk about that after.
4       Q. Do you have any maps showing four times the
5  area that you would be responsible for?
6       A. I have none of those documents anymore.
7  They're all in the back of the truck that was
8  stolen.
9       Q. Okay. Turning back to Exhibit 2, is there
10 anyone else besides you or AGCT who would have
11 documents responsive to these requests on behalf
12 of the plaintiffs?
13      A. I'm sure Yale has it. Sal Garibaldi would
14 have the information. I'm sure Joe Signore has
15 the information.
16      Q. Well, your lawyers never served any
17 discovery requests in this case. Are you aware of
18 that?
19      A. My first attorney, from what I was told,
20 missed all the opportunities to do that. We were
21 in court together that day.
22      Q. Did you ever have any Cloud services or
23 backup for your computer?
24      A. No.
25      Q. Did you have a server?

Page 49

1  filed in Connecticut state court on behalf of
2  NESAIM; correct?
3    A. Yes.
4    Q. And this contract is between Yale and AGCT
5  doing business as NESAIM; correct?
6    A. It was updated and changed to that, yes.
7    Q. But that's the only contract you're aware
8  of, correct?
9    A. Well, originally -- yes, but this contract
10 was amended after the meeting.
11   Q. But you don't have any other contract, do
12 you?
13   A. No.
14   Q. Okay. So this is the only contract you
15 have, correct?
16   A. Correct.
17   Q. And this contract is between Yale and AGCT
18 doing business as NESAIM; correct?
19   A. Yes.
20   Q. Okay. With respect to the discovery
21 responses, they've been marked as Exhibit 2 for
22 identification. I'd like you to turn to
23 Interrogatory Number 3, which is on page 3.
24       In your answer there, you broadly claim at
25 the end that "The defendant and its agents

Page 50

1  discriminated against the plaintiffs on the basis
2  of race." Do you see that?
3    A. Yes.
4    Q. Is there anyone else, other than Joe
5  Signore, who you claim discriminated against you
6  or NESAIM in connection with your claims in this
7  lawsuit?
8    A. It was just Joe.
9    Q. Okay. So Paul Catalano did not discriminate
10 against you?
11   A. No, Paul was a witness there.
12   Q. Okay.
13   A. And he walked out because he was so
14 disgusted on how Joe was acting.
15   Q. At the meeting?
16   A. Yes.
17   Q. Okay. But just to be clear, in connection
18 with your claims of discrimination in this
19 lawsuit, and to the extent that they factor into
20 the lawsuit that was recently filed in Connecticut
21 state court on behalf of NESAIM, it is only Joe
22 Signore who you allege took discriminatory acts
23 against you; correct?
24   A. Correct.
25   Q. Okay. In response to Interrogatory Number

Page 51

1  4, and specifically 4(b), we asked -- well,
2  question withdrawn.
3       In your answer to Interrogatory Number 4(b),
4  you claim "I believe that the defendant ended the
5  contractual relationship by email." Correct?
6    A. Yes.
7    Q. Okay. Do you have that email?
8    A. No, I do not.
9    Q. Okay. You were present for Charles Fetters'
10 deposition, correct?
11   A. Yes, I was.
12   Q. Okay. And you heard him testify that he
13 ended the contractual relationship with Yale by
14 calling Sal Garibaldi and asking to be removed
15 from the list of contractors due to both Charles
16 Fetters' own financial concerns and his own health
17 concerns; correct?
18   A. I heard him say that, yes.
19   Q. Do you disagree with that?
20   A. I don't recall what his health was like at
21 the time. I know Charles has had a lot of health
22 issues. I think it -- well, it doesn't matter
23 what I think. Yes, I'll -- he -- Charles did, by
24 phone call with Sal and email, end that contract
25 with AGCT.

Page 52

1    Q. Doing business as NESAIM.
2    A. Yes.
3    Q. Okay. So it is not correct that the
4  defendant ended the contractual relationship by
5  email, is it?
6    A. I would have to see the emails between the
7  two of them. I don't know what they are.
8    Q. Well, Mr. Fetters produced everything he
9  had, and he said he did not have an email showing
10 that. He said it was a phone call that he made to
11 Sal Garibaldi to request that AGCT doing business
12 as NESAIM be removed from the list of contractors.
13   A. I'm aware of a phone call, and was told that
14 there was an email that was sent after.
15   Q. Okay. But it wasn't the defendant, meaning
16 it wasn't Yale, who ended the contractual
17 relationship, was it?
18   A. As far as I know, no.
19   Q. Okay. It was Charles Fetters who ended the
20 contractual relationship by calling Sal Garibaldi
21 and asked that AGCT Corp. doing business as NESAIM
22 LLC be removed from the list of contractors,
23 correct?
24   A. Yes. But the reason -- do I answer the
25 reason why he chose to do that?

Page 69

1    information for Carlos."
2         A. The problem with this, and I don't
3    understand, maybe -- they didn't do a walkthrough
4    until after we met. I know what you're saying.
5         Q. Okay. The date of the e-mail is November
6    13, --
7         A. 13.
8         Q. -- correct?
9         A. Right.
10        Q. And he says "This is the area we walked
11   yesterday," right?
12        A. Right.
13        Q. Which would mean November 12th.
14        A. Correct.
15        Q. And you're now testifying that you don't
16   think that ever happened?
17        A. That's not what I said.
18        Q. Okay.
19        A. I just know that before a walkthrough took
20   place, we had the meeting in the office, to the
21   best of my recollection.
22        Q. The meeting that you allege -- question
23   withdrawn.
24            Do you allege that Mr. Signore made these
25   racially discriminatory comments at any other

Page 70

1    occasion besides the meeting that you say happened
2    on November 29, 2019?
3         A. That I personally witnessed?
4         Q. Yes.
5         A. No.
6         Q. Do you know anybody else who witnessed Mr.
7    Signore making racially discriminatory comments
8    about you on any other occasions?
9         A. I was aware of when Paul Catalano called and
10   I answered the phone.
11        Q. That's when he said he had a problem with
12   you, correct?
13        A. I didn't get into the whole conversation.
14   If you'd like, I can. "He doesn't like him, he
15   doesn't like Black contractors."
16        Q. Paul Catalano called you and said "Joe
17   Signore doesn't like Black contractors"?
18        A. Paul Catalano called me. He said "I want to
19   give you a heads up. You guys have some guy named
20   Todd Howell." I said "Yes."
21        Q. Who did he think he was talking to?
22        A. Another --
23            MS. MILLER: Excuse me, counsel, you're
24   cutting the witness off.
25            MR. SHEA: He can tell me.

Page 71

1            MS. MILLER: Let him finish his answer.
2            MR. SHEA: He's perfectly capable --
3            MS. MILLER: And he did not perhaps know
4    that he can tell you he's not finished his answer.
5            So if you haven't finished your
6    answer --
7         A. I did not know that.
8            MS. MILLER: -- let him know.
9         Q. Well, I did include that my instruction
10   despite your hundreds of depositions; but yes.
11        A. Why do we have to go to sarcasm.
12        Q. I'm just saying --
13        A. You're being sarcastic right now. I'm
14   trying to be here as a gentleman and you're being
15   facetious and argumentative --
16        Q. I'm pointing out that --
17        A. -- and sarcastic.
18        Q. -- I gave you those instructions.
19           MS. MILLER: I think you all are cutting
20   across each other. So we want to have the court
21   reporter be able to get a good transcript, so
22   guys, please.
23           THE DEPONENT: I just want to reduce the
24   hostility where we're going. It's unnecessary.
25        Q. Can you answer the question, sir?

Page 72

1         A. Can you ask it again, please?
2         Q. Sure. Do you allege that Joe Signore made
3    racially discriminatory comments about you on any
4    other occasion besides the November 29, 2019
5    meeting at the groundskeeper's building?
6         A. Not that I personally witnessed.
7         Q. Okay. And then I asked you if you are aware
8    of anyone else who you believe witnessed Joe
9    Signore making racially discriminatory comments
10   about you at any other time.
11        A. And I stated, Paul Catalano called me and
12   told me. I don't know what Joe and Paul talk
13   about. I don't know about the other issues Joe
14   has had with other people, his history. And
15   unfortunately, we didn't have discovery because
16   Bill, whatever, didn't do his job.
17           There's -- I can't say he's never said it.
18   That date, I was taken aback by all the things
19   that he said. I mean, I was -- you know, like as
20   Carlos stated, at first, I thought Joe was
21   kidding. And then he just went on a tirade.
22        Q. I understand. We're talking about the
23   meeting there, though.
24        A. Correct.
25        Q. I'm asking you about any other times besides

Page 73

1   the meeting.
2       A. The only thing that I would be aware of --
3   and I don't know, I wasn't there for Joe to say
4   it -- he must have said something to Paul for Paul
5   to call.
6       Q. But in terms of what Paul said to you, did
7   Paul say that Joe Signore harbored racial
8   discrimination against you?
9       A. He said that he did not like -- "If you got
10  a guy named Todd Howell, he doesn't like Todd, he
11  doesn't like Black people," and he just does --
12  something with Todd and being a Black contractor
13  and Black contractors in general.
14      Q. That's what Paul Catalano said to you?
15      A. Partially, yes.
16      Q. Okay. So other than the conversation with
17  Paul Catalano in which he allegedly conveyed that
18  information about Mr. Signore, and the meeting
19  that you claim happened on November 29, 2019 at
20  the groundskeeper's office, where Mr. Signore
21  allegedly made these racial epithets directly in
22  front of you, are you aware of any other occasions
23  on which Joe Signore said anything racially
24  discriminatory about you or NESAIM?
25      A. Not that I'm aware of.

Page 74

1       Q. Okay. And was there -- question withdrawn.
2           With respect to the meeting that you say
3   took place on November 29, 2019 at the
4   groundskeeper's building, was there anyone else
5   present at that meeting, to your recollection,
6   other than you, Carlos Arroyo, Paul Catalano,
7   Andrea Wolfe, Charles Fetters, and Joe Signore?
8       A. There was another -- the room was set up
9   like this. It's like a small conference room.
10  There was another gentleman, older gentleman, who
11  was in that room. I don't know what he was doing.
12  But within like 15, 20 minutes in the beginning,
13  he's like "Well, I'm out of here. I'm not getting
14  involved in all this because I know where this is
15  heading," and he left. And I don't know who he
16  is.
17      Q. Besides that person, are you aware of anyone
18  else --
19      A. No.
20      Q. -- who was in attendance at that meeting.
21          In your response to Interrogatory Number 20,
22  you state that you experienced severe health
23  issues for a period of time thereafter. "I was
24  hospitalized under medical care." Do you see
25  that?

Page 75

1       A. Getting to it right now.
2       Q. Do you see your answer there, sir?
3       A. Yeah, I'm looking. You mentioned
4   Interrogatory Number 5, so I wanted to see what
5   that question was.
6       Q. Have you read that response?
7       A. Yes.
8       Q. Okay. So the first question is, were the
9   health issues that you are referring to in
10  response to Interrogatory Number 20 in any way
11  related to or as a result of the allegations in
12  this lawsuit?
13      A. I believe the stress of that exacerbated a
14  condition that I had previously.
15      Q. Has any doctor told you that?
16      A. From stress, yes, probably my heart doctor.
17      Q. Do you have any -- any proof of that? Do
18  you have any medical records showing that?
19      A. No. We can get them.
20      Q. We've asked you to produce them and you only
21  stated that you treated with Stony Creek Wellness.
22      A. I believe, from what I remember, they didn't
23  ask for like my health, medical, heart records,
24  all that stuff. I thought you were asking for
25  mental health records.

Page 76

1       Q. The question was "With whom you had treated
2   in connection with the conditions you allege were
3   caused by the allegations in the Complaint." And
4   I'm trying to understand, it looks to me like in
5   your answer to Number 20, you are trying to
6   explain why you didn't take any steps after this
7   contract ended to mitigate your damages because
8   you were hospitalized because you had these severe
9   health conditions. Is that what you're getting at
10  here?
11      A. Partially. But I did take steps with Yale.
12  And I contacted -- I don't have the list with me,
13  but I contacted all the people in these different
14  departments, the HR Department. I contacted Chris
15  Brown, who was the liaison between Yale and
16  minority contractors in the city --
17      Q. You contacted Jonathan Bailey, right?
18      A. I believe so, yes.
19      Q. And he gave you a form to fill out to make a
20  complaint because there is a specific department
21  to make these complaints to at Yale, right?
22      A. Yes.
23      Q. And you never filled out that form, did you?
24      A. Yes, I did.
25      Q. Okay, we'll get to that.

19 (Pages 73 to 76)

Page 77

1  A. That's fine. But I remember talking to him.
2  Q. Do you have that form?
3  A. I haven't -- every document that you're
4  asking me for was in that truck. It was stolen.
5  I have proof that the truck was stolen. Carlos
6  mentioned yesterday, he heard the truck was in New
7  York and I said something. I can explain that, if
8  you want to hear that as well.
9  Q. I'm talking now just about your response to
10  Interrogatory Number 20. It's unclear, your
11  answer, it says "After the unlawful contact of the
12  defendants, I experienced severe health issues."
13     First of all, what are the severe health
14  issues you're referring to there?
15  A. I ended up getting sick again. I had
16  congestive heart failure. My A-Fib started to
17  come back. I was going to -- they had scheduled
18  me for a heart transplant. I was on a Milrinone
19  pump. And I made a decision from my research to
20  have all my teeth removed because it was a big
21  connection between tooth decay and heart disease.
22  And I learned that when I was helping my ex-wife
23  study for med school, when she went to med school.
24  So there was a lot, there were health issues
25  related to what I had going on.

Page 78

1  But this, you know, when your reputation
2  gets attacked and, you know, 2019, 2020, I got to
3  deal with this. As you and I have discussed
4  before in court, I don't run around looking for
5  people to say "Ooh, say something to me." But
6  people say it all the time.
7  Q. Okay. What were the severe health issues
8  that you experienced that you are referring to in
9  your response to Interrogatory Number 20 where you
10  say "I experienced severe health issues for a
11  significant period of time thereafter. I was
12  hospitalized and under medical care."
13  A. I just told you. I went back to the
14  hospital. They were going to give me a heart
15  transplant. I decided to take my teeth out, which
16  saved my life. My congestive heart failure came
17  back. My A-Fib came back. And I was -- I had one
18  foot in the grave and one on a banana peel.
19  Q. And you don't claim that those conditions
20  were caused by any conduct by Yale, do you?
21  A. I believe that situation exacerbated it.
22  I'm not -- I had the condition before. It came
23  back.
24  Q. And do you have any expert testimony or are
25  you aware of any doctor who you haven't disclosed

Page 79

1  in this case who has given you the opinion that
2  the stress that you claim you experienced
3  following what you claim Yale did, caused or
4  contributed to the severe health issues that
5  you've just described?
6  A. I don't have a written statement from a
7  doctor. Now I understand that you want medical
8  doctors, not just mental doctors.
9  Q. Well, that's a requirement for the lawsuit,
10  sir.
11  A. I thought you weren't going to interrupt me.
12  Q. Okay. Continue, please.
13  A. I now fully understand and will work with my
14  new attorney to get you the names of the people of
15  that. I thought the request was for mental
16  health.
17  Q. Well, that's the emotional distress that you
18  claim you suffered, right?
19  A. Well, that's the emotional distress is
20  mental health.
21  Q. Yes.
22  A. And then there's physical health.
23  Q. For your emotional distress you treated with
24  Stony Creek Wellness Group, correct?
25  A. Correct.

Page 80

1  Q. We'll get to those. So Interrogatory Number
2  20 also asked for the mitigation measures, for
3  example, any work you had done since, any bids you
4  made since. And you didn't answer at all.
5     So what I was also trying to figure out is
6  was this answer, you are saying "I wasn't able to
7  do that because of my hospitalization"?
8  A. No, I -- that was right when COVID hit. And
9  I believe Attorney Palmieri had forwarded you the
10  video that I did for the State about --
11  Q. We found that video. He never forwarded it?
12  A. What?
13  Q. You're talking about when you tried to do
14  the protective -- personal protective equipment --
15  A. Yeah.
16  Q. -- as a consultant for AGCT, correct?
17  A. Correct.
18  Q. So you did --
19  A. Nobody send that? He sucks. I sent that to
20  him to send to you.
21  Q. So after Charles Fetters ended the
22  contractual relationship with Yale, AGCT Corp.
23  and you, as their consultant, attempted to pivot
24  business wise to a provider of personal protective
25  equipment because of your perceived need for it in

Page 85

1  my congestive heart failure, my atrial
2  fibrillation. I was laying in bed, half
3  unconscious, with my CPAP on, minding my business.
4  All of a sudden, the door breaks open. There is a
5  police report to it, an arrest. And there's two
6  large white males standing over me, yelling and
7  screaming at me. I'm half in, half out of it.
8  Videotaping me, threatening me, threatening me
9  with violence.
10     I have never seen these men in my life. I
11 didn't know who they were. That was traumatic for
12 me because I live in the projects, and this was
13 crazy. That's the only like medical -- like I was
14 recovering. That lawsuit did not cause those
15 problems.
16     Q. Okay.
17     A. I was recovering from surgery.
18     Q. We'll get into the substance of your actual
19 medical records that we did obtain from Stony
20 Creek Wellness in a bit. But when Judge Farrish
21 was asking you about your compliance in this case,
22 on page 30, midway through your response at the
23 top of page 30, you say, "The only thing about
24 medical records was it was a question he asked,
25 was I seeing anybody during that time. I didn't

Page 86

1  say I was like oh, you know, mentally destroyed
2  over it. Was the same therapist I'd always been
3  going to."
4     I said "You have those records."
5     And then you continue and you say, "I'm
6  answering these questions as a layman the best I
7  can. And I'm not claiming medical damages." Do
8  you see that?
9     A. Yes, I do.
10    Q. Okay. And that was a statement that you
11 made to the judge in open court on the record.
12 Correct?
13    A. Yes.
14    Q. Okay. Is it still true that you are not
15 claiming medical damages in connection with your
16 claims in this lawsuit?
17    A. My layman understanding of -- again, thhis
18 is where my -- I got confused. I didn't look at
19 mental health records as medical records. I
20 looked at medical records as physical things that
21 happen to your body.
22    Q. Okay. So am I correct to understand, then,
23 that the only medical damages you are claiming in
24 connection with your claims in this lawsuit that
25 we are here about today, is the emotional distress

Page 87

1  or mental health damages for which you treated at
2  Stony Creek Wellness?
3     A. And how this added to stress that added to
4  me back in the hospital, yes.
5     Q. Well, you haven't produced any records to
6  show that.
7     A. Again, my misunderstanding. My fault. I'm
8  not an attorney. The attorney I had, which you're
9  well aware of, is sub par and boxed me into a very
10 bad situation. I never got to meet with him.
11    Q. Well, these answers that you provided to us
12 were updated as of April 15, 2024, when you had
13 your new counsel.
14    A. Correct.
15    Q. Okay. And the only treaters who you have
16 identified as treating you in connection with any
17 conditions that you allege were caused or
18 contributed to, based on the allegations in your
19 Complaint, was Stony Creek Wellness, correct?
20    A. Because I -- yes. My interpretation is you
21 only wanted mental records. So I apologize. That
22 is 100 percent my fault.
23    Q. With respect to the emotional distress that
24 you claim you suffered as a result of the conduct
25 you allege by Joe Signore, am I correct to

Page 88

1  understand that the only treatment you have had
2  for emotional distress was with Stony Creek
3  Wellness Group?
4     A. Correct.
5     Q. Okay. And those are the same people and
6  therapists you had already been treating with,
7  correct?
8     A. Correct.
9     Q. And so when you said "I wasn't mentally
10 destroyed by that," to Judge Farrish, you did
11 understand that we were talking about mental
12 health, right?
13    A. Right. I didn't think we were talking about
14 physical health.
15    Q. All right. But you said "I wasn't mentally
16 destroyed" and then you said "I'm not seeking
17 medical damages."
18    A. First of all, I don't remember that day. I
19 don't know if I was arguing with Attorney Palmieri
20 because -- at that time. Second of all, my
21 understanding -- and again, I'm not a lawyer, I'm
22 not a doctor. I'm trying to do the best that I
23 can explaining things. I don't understand how
24 they separate the damages, mental, medical. My
25 misunderstanding. I never considered mental

Page 121

1   losses; correct?
2       A. Yes.
3       Q. Okay. And --
4       A. Well, it says "noneconomic and economic
5   losses."
6       Q. Yes. And in connection with the severe
7   emotional distress that you suffered, we asked you
8   in Exhibit 2, Interrogatory Number 19, which
9   begins on page 22, to "State the names and
10  addresses of each physician, therapist or other
11  source of treatment for the conditions or injuries
12  you allege that you sustained as a result of the
13  incidents alleged in your Complaint, the dates of
14  treatment and the conditions for which you were so
15  treated." You see that?
16      A. Yes, sir.
17      Q. Okay.
18      A. Yes.
19      Q. And in response, you identified that you
20  treated at Stony Creek Wellness Group in Guilford,
21  Connecticut with Tricia Mignosa and Jody Farrell.
22  Correct?
23      A. Correct.
24          (DEFENDANT'S EXHIBIT 10 FOR
25          IDENTIFICATION, Received and Marked.)

Page 122

1       Q. We sought and obtained your authorization to
2   obtain those medical records, which I believe
3   you're aware of because you testified earlier
4   today that those medical records were among the
5   things you reviewed in preparation for today's
6   deposition. Correct?
7       A. Yes.
8       Q. All right. So I have now shown you a copy
9   of those medical records which we have marked for
10  identification as Exhibit 10. Do you recognize
11  those as your medical records from Stony Creek
12  Wellness Group?
13      A. As provided by them, yes.
14      Q. Are you aware of any other copy?
15      A. No. I'm just stating that I didn't have
16  access to their records, so this is what they
17  provided. That's all I'm aware of.
18      Q. Well, you authorized their release to us,
19  right?
20      A. Correct.
21      Q. And you are aware that you could have
22  authorized their release to yourself at any time,
23  correct?
24      A. Correct.
25      Q. Okay. And do you have any reason to dispute

Page 123

1   that these are the records that were obtained with
2   that release?
3       A. When I looked through them, I saw most of
4   the things that were written were by Tricia
5   Mignosa. And I only saw her like once a month or
6   every two or three months. I treated with Jody
7   once or twice a week. But I didn't see, unless I
8   missed it, anything in here from her.
9       Q. These are the records that we obtained with
10  the authorization --
11      A. Correct.
12      Q. -- you provided us. And I'm not aware of
13  any other medical records, nor have you provided
14  any; is that correct?
15      A. Correct.
16      Q. Okay.
17      A. But my main person that I -- you asked for
18  therapists.
19      Q. Yes.
20      A. I don't -- I didn't see anything, unless I
21  made a mistake, that Jody put in here.
22      Q. Well, turning your attention first to --
23  it's actually the 17th page of the records, but on
24  the fax at the top, it will be identified as the
25  19th page of 27. You see that?

Page 124

1       A. Yes.
2       Q. Tell me when you're there.
3       A. I'm there.
4       Q. Okay. You see that's your visit with Tricia
5   Mignosa on September 19 -- I'm sorry, September
6   18, 2019; correct?
7       A. Yes.
8       Q. Okay. And that was before you or NESAIM or
9   AGCT Corp. entered into any contract with Yale,
10  correct?
11      A. Yes.
12      Q. And at that time, the chief complaint that
13  you reported was "I'm having a physical issue that
14  affects me mentally," correct?
15      A. Yes.
16      Q. Was what the physical issue you were having
17  that was affecting you mentally at that time?
18      A. That's recovering from my heart stuff.
19  Prior -- because I had had that a few years
20  earlier. And it had really, for me as a person, I
21  was really active. I did a lot of things,
22  running, biking, swimming, I couldn't do these
23  things anymore. So it's been a very slow, slow
24  process to get back to even trying to be how I
25  was.

Page 125

Q. Okay. And at that time, again, before anything to do with Yale or Joe Signore or the contract, you were already diagnosed with a moderate recurrent major depression and generalized anxiety disorder. Correct?
A. Correct.
Q. For how long had you had those diagnoses, if you know?
A. I do not.
Q. For years?
A. Probably.
   MS. MILLER: You need to speak up.
   THE DEPONENT: I'm sorry.
A. I do not remember, I do not recall how many years.
Q. But was it a period of years --
A. Yes.
Q. -- previous to that?
A. Yes.
Q. And the medication list there, do you still take all of the medications identified in that list?
A. No.
Q. What don't you take?
A. Well, when you -- I'm specifically going to

Page 126

go through the OxyContin thing. The reason that's on my list is once we found a medicine that worked with all my other medicines, and the heart doctors agreed, they said "Leave it on there in case you ever get hurt."
   I don't like pain pills. I just recently hurt my back and they gave me two of these things. That's not my thing. But they're left on in case, because there's other medicines that will not interact with these correctly. So that's why that's on there.
Q. Okay. So the OxyContin is just kind of an as-needed thing that you don't take much, if at all?
A. Yeah.
Q. How about the other medications identified there?
A. I'm off the Wellbutrin.
Q. Since when?
A. Years ago.
Q. Okay.
A. The Lorazepam, that's for like anxiety, for stressed out. I usually, like every three, four weeks, you know, I might take one or something. Now, there's another Wellbutrin XL, because they

Page 127

had bumped it up to 450. I got to come back to that. It's like on the tip of my tongue. Trazodone, I try not to take it ever. It's a sleeping pill. Take it as-needed. If I have been up for two days and I can't sleep, then I'll take one of those. I don't know what the Flexeril is, Flexeril.
Q. It's a muscle relaxer.
A. Oh, that's on that list. That's -- that's another thing that's on that list. I don't take that crap every day. Testosterone, I do not take the injections. I had surgery and I have pellets implanted in me. What is Amiodarone?
Q. I don't know.
A. Okay. I'd have to look that up. Magnesium, I take. Aspirin, I take. Losartan, Gabapentin, I take.
   MS. MILLER: Mr. Howell --
   THE DEPONENT: I'm sorry, I am so sorry.
A. The magnesium oxide, the aspirin, I take. And the Gabapentin. I can get you a full list, a current list. I didn't know you wanted that.
Q. No, I'm just asking you from the time --
A. Okay.
Q. -- from what you were taking before any of

Page 128

the claims in this lawsuit.
   Okay, so now, turning to two pages ahead, the one that's 21 of 27, it's actually the 19th page of the exhibit, but it says 21 of 27 up top.
A. Okay.
Q. That is a visit with Tricia Mignosa dated December 9 -- I'm sorry, December 4, 2019, correct?
A. Mm-hmm.
Q. Is that "Yes"?
A. Yes.
Q. Okay. And that would have been only a couple days after the meeting with Mr. Signore, correct?
A. Correct.
Q. And you'll agree with me, having reviewed these records, they don't mention anything about that, do they?
A. Oh, no. That's not the therapist I saw for that. That's why I don't understand what they say. Tricia was only the APRN. Tricia only gave me medicines. She was not my -- like I would go see Jody and sit down and go "Oh, Jody, this is what's bothering me. Oh, Jody, my daughter is doing great." She would sit with me for maybe

Page 129

1  five minutes, "So how's it going, okay, here's
2  your medication," out the door. She wasn't my --
3  she was my APRN. She was the person that
4  prescribes medicines.
5      Q. Okay. These are the only records we have.
6      A. I see that. And that's why I reviewed them.
7      Q. If you are able to obtain --
8      A. I'm going to request them again, to ask why
9  Jody's weren't in there.
10     Q. Okay.
11     A. Because Jody was my therapist.
12     Q. So once again, we're going to hold this
13 deposition open for a variety of matters, but if
14 you are claiming that there are additional therapy
15 records --
16     A. I don't know if they have -- I don't know
17 how therapists keep records, but I'm telling you
18 the therapist I met with. And that's why I said I
19 didn't see anything from Jody.
20     Q. So you'll agree with me there is nothing in
21 the record from this visit that relates to
22 anything to do with anything that Joe Signore said
23 or any distress, correct?
24     A. Nothing.
25     Q. Okay. So your chief complaint, you know, in

Page 130

1  that section of this record, as of December 4,
2  2019 was "I feel like I came out of a three to
3  four-year fog." Correct?
4      A. Correct.
5      Q. So you were feeling good at that time,
6  correct, or that's what you reported?
7      A. That's what I reported to her. But my
8  conversations with her were only related to
9  medicine. It was very -- I read a few comments
10 about, you know -- she was really didn't dig into
11 how my life is going. She was like "Did this
12 medicine work, did that medicine work," you know,
13 there's a thing in there, "Did you break up with
14 Andrea," I told her that. It wasn't like a normal
15 therapy. I don't know if you've ever been in
16 therapy, but that's not what this was like.
17     Q. But I want to focus on what's in these
18 records, okay?
19     A. Yes, sir.
20     Q. You're not claiming that anything she wrote
21 here is inaccurate, are you?
22     A. No.
23     Q. So what she writes under the Subjective
24 section, which is what you reported, is that you
25 reported that you have been doing well, you feel

Page 131

1  more like yourself than you had in a long time.
2  You discussed with her getting back into the
3  workforce and a new business venture with your
4  girlfriend, correct?
5      A. Correct.
6      Q. And the business venture with your
7  girlfriend was actually the snow removal work you
8  were doing with Yale. Correct?
9      A. No, the new business venture we were getting
10 into was AGCT.
11     Q. And that's --
12     A. Part of AGCT was the Yale thing. This, by
13 that statement, I'm just stating, you know, she's
14 asking what's going on in my -- you know, with the
15 business, well, you know, excited to have a
16 business venture with somebody that I'm in love
17 with.
18     Q. Okay. And that business venture was AGCT,
19 correct?
20     A. As -- yes, as a consultant for them.
21     Q. And at that time, there was no pandemic, so
22 there was no personal protective equipment, right?
23     A. No.
24     Q. That's correct?
25     A. Well, no, sir. Because of the government

Page 132

1  contracting, all of a sudden they started asking,
2  in September, for a weird amount of gloves and
3  PPE. And like there was a list called Sam.gov,
4  and it lists all the bids. There was like a
5  hundred thousand on there. But all of a sudden,
6  certain things were jumping out, like why are they
7  asking for a million body bags. So we knew
8  something was coming, but we didn't know what.
9      Q. But you never ended up doing any work in
10 connection with that, did you?
11     A. We did very little. We bid a lot of work we
12 didn't get it.
13     Q. And the only work you ended up doing with
14 AGCT was the snow removal work with Yale?
15     A. As a consultant with them, yes.
16     Q. And you were a consultant with them for
17 approximately 14 months, according to your
18 answers, right?
19     A. I believe so, yes.
20     Q. So the answers we looked at earlier today,
21 you said "After the November 29, 2019 meeting, I
22 acted as a consultant for AGCT for approximately
23 14 months."
24     A. Well, I was a consultant for them prior to
25 that, but yes.

Page 133

1    Q. Well, I was just projecting out, so the
2    consultancy arrangement that you had with them
3    ended when the contractual relationship that you
4    had with Yale ended; correct?
5    A. No, it continued a little after that. But
6    it was -- it was all falling apart.
7    Q. Okay. And getting back into the workforce,
8    as opposed to what? You said you discussed
9    getting back into the workforce. Had you been out
10   of the workforce?
11   A. I just hadn't been feeling myself. Like
12   after that congestive heart failure A-Fib, it was
13   hard for me to walk. We found out that statins,
14   one of the medications I was on, if you have -- if
15   you don't have high cholesterol, it makes your
16   muscles cramp. And so once we figured that out,
17   and I got the statin out and I was able to walk
18   around, I was like "Oh, my God, I can't believe
19   this." So...
20   Q. And you denied any alcohol or substance
21   abuse, correct?
22   A. Yes, that's not me.
23   Q. Do you know what "Denies AEs of medications"
24   means?
25   A. Denies -- where do you see that?

Page 134

1    Q. It's on the same, Subjective?
2    A. What page are you on.
3    Q. We're on page 21. The bottom of the
4    Subjective says "Denies alcohol or substance
5    abuse." I'm guessing from the context that means
6    denies abuse of medications.
7    A. I guess.
8    Q. And you don't dispute the accuracy of this
9    record, do you?
10   A. No.
11   Q. Okay. And the next visit that you had with
12   Tricia Mignosa begins on the fax page 23, it's the
13   21st page of this exhibit, and it's dated March 4,
14   2020; correct?
15   A. Mm-hmm.
16   Q. Is that "Yes"?
17   A. Yes.
18   Q. Okay. So that would have been shortly after
19   the end of the snow removal work that you did in
20   that first year under the contract, correct?
21   A. Yes.
22   Q. Okay. And again, you'll agree with me,
23   having reviewed this record, this doesn't mention
24   anything to do with Mr. Signore or any distress
25   you were feeling as a result of any conduct by

Page 135

1    Yale, correct?
2    A. No, I didn't talk to Trish about that.
3    Q. Okay. And in fact, the chief complaint
4    says, "Remember when I first started treatment,"
5    which from what I gather, you meant "Look how far
6    I've come."
7    A. Correct.
8    Q. Okay. So you were feeling pretty good at
9    that time?
10   A. Yeah. The big -- like I said, the big thing
11   was the statin. Walking to the bathroom would
12   have taken me 20 minutes before.
13   Q. And she says the last time you had been
14   seen, which we just talked about, was the December
15   4, 2019 visit. And she reports that you continue
16   to do well with your mood and anxiety on your
17   current medication, and that you discussed the
18   issues leading to your treatment, as indicated by
19   your chief complaint, including medical and
20   psychosocial problems.
21   A. Where's that?
22   Q. It's this --
23   A. This part?
24   Q. Right here.
25   A. Oh. I'm sorry, I didn't bring my glasses.

Page 136

1    A. Okay.
2    Q. And it says you're finding your current
3    medication and therapy effective, correct?
4    A. Yes.
5    Q. Is that true?
6    A. Yes.
7    Q. Okay.
8    A. With her, yes.
9    Q. And it reports that you continue in your
10   business venture with the girlfriend, which has
11   been going well. Correct?
12   A. Yes.
13   Q. Okay. Was that true?
14   A. It was going well because of the radical
15   change that I had to do in my business to make
16   that one survive and keep working.
17   Q. But you didn't mention any distress you were
18   experiencing based on that change, did you?
19   A. Not to her. She just asked how the business
20   was going. It was very informal. It wasn't a
21   regular therapy session. It was more about
22   medications.
23   Q. And you reported that you still have a
24   construction company, but it's dormant at present,
25   and you plan to get into general contracting work.